## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| ALLSTATES REFRACTORY CONTRACTORS, LLC, <br><br> *Plaintiff,* <br><br> v. <br><br> MARTIN J. WALSH, in his official capacity as Secretary of Labor, <br><br> UNITED STATES DEPARTMENT OF LABOR, <br><br> JAMES FREDERICK, in his official capacity as Acting Assistant Secretary of Labor for Occupational Safety and Health, <br><br> OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, <br><br> *Defendants.* | Civil Action No. _____ <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Allstates Refractory Contractors, LLC ("Allstates") brings this action against the above-named Defendants, alleging as follows:

## INTRODUCTION

1. This case challenges Congress's delegation of extraordinary legislative power to the Executive Branch in the Occupational Safety and Health ("OSH") Act as a violation of the nondelegation doctrine.

2. Article I of the Constitution vests all legislative power in Congress. Under the nondelegation doctrine, Congress may not delegate its legislative power to the Executive Branch. This fundamental principle preserves the Constitution's

separation of powers because it prevents the Executive Branch from wielding both the power to write the law and the power to enforce the law.

3.     Section 6(b) of the OSH Act contains an extraordinary delegation of legislative power authorizing the Secretary of Labor to promulgate "any occupational safety or health standard" regulating every employer in the United States.  29 U.S.C. § 655(b).  Congress's only guidance is that these agency-created standards must be "reasonably necessary or appropriate to provide safe or healthful employment and places of employment."  *Id.* § 652(8).  The statute does not provide any guidance or limitation on what makes a health or safety standard "reasonably necessary" or "appropriate."

4.     The Secretary, acting through the Occupational Safety and Health Administration ("OSHA"), has used this sweeping delegation of legislative authority to promulgate onerous safety standards governing every employer in the United States.  Although Congress provided zero guidance as to which standards are "reasonably necessary" or "appropriate," OSHA's safety standards govern the workplace in striking detail—from fall protection to personal protective equipment. In many cases, these one-size-fits-all standards are so burdensome and counterproductive that they actually make workplaces less safe because they prohibit employers from using superior methods to protect their employees from workplace injuries in certain contexts.  And these standards impose enormous costs on employers—costs to comply, to train employees how to comply, to inspect

2

employees and equipment and worksites, and to purchase safety equipment that complies with OSHA's standards.

5.     In addition to writing the law, OSHA aggressively enforces its own safety standards against employers throughout the country, including in Ohio. OSHA conducts more than 30,000 inspections each year threatening to fine employers for violating its safety and health standards.  OSHA's intrusive inspections and arbitrary enforcement practices are notorious—for example, OSHA has invited union representatives to participate in safety inspections, threatened employers with increased inspections for failing to enact safety measures going beyond existing law, sought to impose penalties for alleged violations outside the statute of limitations, and arbitrarily enforced its standards against some employers but not others.  As then-Judge Kavanaugh observed, OSHA has used its enforcement power to stretch beyond the limits of its statutory authority and engage in arbitrary enforcement by "treating similar cases dissimilarly."  In fiscal year 2019, for example, OSHA fined employers more than $142 million.  Thus, with its blank-check authority and scores of standards, OSHA has mandated its own arbitrary view of safety, as shown by its steady stream of citations and fines.

6.     The OSH Act violates the nondelegation doctrine because it delegates Congress's legislative power to the Secretary without providing any intelligible principle about what constitutes a "reasonably necessary" or "appropriate" health or safety standard.  This extraordinary delegation of legislative power unites in OSHA

both the power to write the law and the power to engage in abusive and arbitrary enforcement of the laws it has written.

7.      This Court should uphold the fundamental constitutional principle that only Congress may exercise the legislative powers of the federal government. It should declare Section 6(b) of the OSH Act unconstitutional and issue an injunction against enforcement of the OSH Act to the extent such enforcement is predicated on Section 6(b).

JURISDICTION AND VENUE

8.      This Court has jurisdiction over this case under 28 U.S.C. § 1331 because Allstates' claim arises under the U.S. Constitution.

9.      This Court has the authority to grant declaratory and injunctive relief under the Declaratory Judgment Act and this Court's inherent equitable powers. 28 U.S.C. §§ 2201, 2202.

10.     Jurisdiction is proper in this Court because Allstates challenges the facial constitutionality of the OSH Act under the U.S. Constitution.  *See* 28 U.S.C. § 1331.  Allstates does not challenge the validity of any particular standard, *cf.* 29 U.S.C. § 655(f), or any enforcement order, *id.* § 660; *see also, e.g.*, *Free Enter. Fund v. PCAOB*, 537 F.3d 667, 671 (D.C. Cir. 2008), *aff'd in part, rev'd in part, and remanded*, 561 U.S. 477, 489 (2010); *Time Warner Ent. Co., L.P. v. FCC*, 93 F.3d 957, 965 (D.C. Cir. 1996).

11.     Venue is proper in this district because Allstates resides in this district.  28 U.S.C. § 1391(e)(1)(C).

4

## PARTIES

12.     Allstates Refractory Contractors, LLC, is a full-service industrial process general contractor serving the glass, metals, and petrochemical industries. Allstates is an employer with employees who regularly work on jobs throughout Ohio and around the country.  Allstates' principal place of business is in Toledo, Ohio.

13.     Defendant Martin J. Walsh is the Secretary of Labor and is sued in his official capacity.

14.     Defendant United States Department of Labor is an agency of the United States government.

15.     Defendant James Frederick is the Acting Assistant Secretary of Labor for Occupational Safety and Health and is sued in his official capacity.

16.     Defendant Occupational Safety and Health Administration is an agency within the Department of Labor.

## BACKGROUND

### I.     The Nondelegation Doctrine

17.     Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const. art. I, § 1.

18.     "Accompanying that assignment of power to Congress is a bar on its further delegation."  *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality).  Under the nondelegation doctrine, Congress may not "delegate . . .

5

powers which are strictly and exclusively legislative." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42–43 (1825).  This doctrine is "rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).  "[T]he lawmaking function belongs to Congress," *Loving v. United States*, 517 U.S. 748, 758 (1996), and Congress "may not constitutionally delegate [that] power to another" body, *Touby v. United States*, 500 U.S. 160, 165 (1991).

19.    The nondelegation doctrine thus prevents the Executive Branch from writing the laws it "is charged with enforcing" because "to 'unit[e]' the 'legislative and executive powers ... in the same person' ... would be to mark the end of any meaningful enforcement of our separation of powers and invite the tyranny of the majority that follows when lawmaking and law enforcement responsibilities are united in the same hands." *Gundy*, 139 S. Ct. at 2144–45 (Gorsuch, J., dissenting).

20.    To that end, the nondelegation doctrine guards against the promulgation of laws written not by Congress but by the Executive Branch.  At the very least, as the Supreme Court has emphasized, the prohibition on overbroad delegations of legislative authority requires Congress to provide "intelligible principle[s]" that, in turn, guide and limit the Executive Branch's discretion in promulgating regulations. *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001).

II.     **Congress's Delegation of Legislative Power in the OSH Act**

21.     This case involves an extraordinary delegation of legislative power that lacks any intelligible principle and thus violates the nondelegation doctrine.

22.     Congress enacted the OSH Act in 1970 to "assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources."  29 U.S.C. § 651(b).  Instead of enacting workplace safety rules itself, Congress delegated that task to the Executive Branch "by authorizing the Secretary of Labor to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce."  *Id.* § 651(b)(3).

23.     Section 6(b) of the OSH Act contains one such delegation of authority.  *See id.* § 655(b).  In particular, Section 6(b) delegates legislative power to the Secretary to "promulgate, modify, or revoke any occupational safety or health standard," *id.*, that the Secretary believes is "reasonably necessary or appropriate to provide safe or healthful employment and places of employment," *id.* § 652(8).[1]  The Secretary, in turn, has delegated this authority to the Assistant Secretary of Labor for Occupational Health and Safety, who serves as the head of OSHA.  *See* 29 C.F.R. §§ 1911-1911.18.

_____

[1] A separate provision, Section 6(b)(5), authorizes the Secretary to "promulgat[e] standards dealing with toxic materials or harmful physical agents." 29 U.S.C. § 655(b)(5); *see, e.g.*, 29 C.F.R. § 1910 subpart Z.  The standards promulgated pursuant to Section 6(b)(5) are known as "health" standards.  Allstates does not challenge Section 6(b)(5).  It challenges only the delegation in the first sentence of Section 6(b) of the OSH Act.

24.     Section 3(8) of the OSH Act defines the phrase "occupational safety and health standard" used in Section 6(b) as "a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment."  29 U.S.C. § 652(8).

25.     Section 5(a)(2) of the OSH Act provides that every "employer" "shall comply with occupational safety and health standards promulgated under this chapter."  *Id.* § 654(a)(2).  The OSH Act defines "employer" as "a person engaged in a business affecting commerce who has employees.*"  *Id.* § 652(5).

26.     Section 17 of the OSH Act imposes civil and criminal penalties on employers who fail to comply with the statutory mandate to follow all OSHA standards.  *Id.* § 666.  In particular, Section 17(a) authorizes OSHA to impose civil penalties up to $70,000 for each willful or repeated violation of a safety standard. Section 17(b) requires OSHA to impose civil penalties up to $7,000 for each serious violation of a safety standard.  (If a violation is not serious, OSHA may impose civil penalties up to $7,000 under Section 17(c)).  Congress is considering amending Section 17(a) and 17(b) to increase the civil fines to $700,000 and $70,000, respectively.  *See* H.R. 5376, 117th Cong. § 21004(a) (2021).

27.     Over 40 years ago, then-Justice Rehnquist explained that Section 3(8) of the OSH Act—as it informs Section 6(b)—does not serve as "a general check" on OSHA's authority under Section 6(b).  *Indus. Union Dep't., AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 681 (1980) (Rehnquist, J., concurring in the

8

judgment).  For that reason, Justice Rehnquist argued that even Section 6(b)(5) of the OSH Act—a delegation of legislative power not at issue in this case, *see supra* n.1—violates the nondelegation doctrine because it ignores the principle that "important choices of social policy [must be] made by Congress, the branch of our Government most responsive to the popular will."  *Indus. Union*, 448 U.S. at 685 (Rehnquist, J., concurring in the judgment).  Among other things, the OSH Act empowers unelected bureaucrats to decide "one of the most difficult issues that could confront a decisionmaker: whether the statistical possibility of future deaths should ever be disregarded in light of the economic costs of preventing those deaths."  *Id.* at 672.  That is fundamentally a political value judgment, not a technical question that can be resolved through the neutral application of agency expertise.  "It is difficult to imagine a more obvious example of Congress simply avoiding a choice which was both fundamental for purposes of the statute and yet politically so divisive that the necessary decision or compromise was difficult, if not impossible, to hammer out in the legislative forge."  *Id.* at 687.

28.    Other courts likewise have recognized that the extraordinary delegation in Section 6(b) of the OSH Act almost certainly violates the nondelegation doctrine.  "As was true of the standard upset in *Schechter*, the scope of the regulatory program is immense, encompassing all American enterprise."  *Int'l Union, UAW v. OSHA*, 938 F.2d 1310, 1317 (D.C. Cir. 1991).  "OSHA's proposed analysis would give the executive branch untrammelled power to dictate the vitality and even survival of whatever segments of American business it might choose."  *Id.*

9

at 1318.  In response, OSHA has adopted—and frequently applies—its own limiting

construction in an attempt to avoid the nondelegation problem.  *See* 58 Fed. Reg.

16612-02, 16614 (Mar. 30, 1993).  But an agency cannot "cure an unlawful

delegation of legislative power by adopting in its discretion a limiting construction

of the statute." *Whitman*, 531 U.S. at 472.  After all, the constitutional separation

of powers requires Congress, not the Executive Branch, to properly limit any

delegation of authority to the Executive Branch.

## III.  OSHA's Promulgation of Safety Standards Pursuant to Congress's Delegation of Legislative Power in the OSH Act

29.  Relying on Congress's delegation of legislative power in the OSH Act,

OSHA has promulgated scores of "safety" standards.  These are just a few of the

safety standards applicable to employers.

30.  OSHA requires employers to provide safety training and education for

each employee.  29 C.F.R. §§ 1926.20 to .21; *see also* 29 C.F.R. § 1910.12 (adopting

the standards imposed in 31 C.F.R. part 1926 as "occupational safety and health

standards under section 6 of the" OSH Act).

31.  OSHA requires employers to ensure that all walking-working surfaces

in the workplace—including ladders, stairways, and more—conform to the agency's

specifications.  29 C.F.R. §§ 1910.21 to .27, 1926.1052 to .1053.

32.  OSHA requires employers to provide special hazard and safety

training for each employee using ladders and stairways.  29 C.F.R. § 1926.1060.

33.    OSHA requires employers to provide specific, enumerated protections for each employee "exposed to fall and falling object hazards."  29 C.F.R. §§ 1910.28, 1926.500 to .502, 1926.759.

34.    OSHA requires employers to provide "a training program for each employee who might be exposed to fall hazards."  29 C.F.R. § 1926.503.

35.    OSHA requires employers to comply with the agency specifications for personal fall protection systems.  29 C.F.R. § 1910.140; *see also* 29 C.F.R. § 1910.29.

36.    OSHA requires employers to train and retrain employees on the "care, inspection, storage, and use" of all fall protection systems and equipment covered by agency regulations.  29 C.F.R. § 1910.30.

37.    OSHA requires employers to maintain exit routes that conform to the agency's specifications, as well as "emergency action plan[s]" that cover a range of specified procedures to be followed in emergency situations.  29 C.F.R. §§ 1910.36 to .38.

38.    OSHA requires employers to conform any "powered platform installations permanently dedicated to interior or exterior building maintenance" to the agency's specifications.  29 C.F.R. § 1910.66.

39.    OSHA requires employers to ensure vehicle-mounted elevating work platforms, including aerial lifts, conform to the agency's specifications.  29 C.F.R. § 1910.67; 29 C.F.R. § 1926.453.

11

40.     OSHA requires employers to ensure that the construction, maintenance, inspection, and operation of manlifts conform to the agency's specifications.  29 C.F.R. § 1910.68.

41.     OSHA requires employers to conform to the agency's specifications regarding the erection and use of scaffolds, and to train each employee who will perform work while on a scaffold.  29 C.F.R. §§ 1926.451 to .452, 1926.454.

42.     OSHA requires employers to conduct a hazard assessment of the workplace, identify appropriate personal protective equipment for its employees in light of those hazards, train and test the employees on the use of the personal protective equipment, and provide such personal protective equipment to employees at no cost.  29 C.F.R. § 1910.132; *see also* 29 C.F.R. § 1926.28 (providing that employer is responsible "for requiring the wearing of appropriate personal protective equipment").

43.     OSHA requires employers to comply with the agency requirements for eye, face, head, foot, respiratory, and hand protection.  29 C.F.R. §§ 1910.133 to .138, 1926.95, 1926.100 to .103; *see also* 29 C.F.R. § 1926.1153 (establishing respiratory protection guidelines for construction workers exposed to crystalline silica).

44.     OSHA requires employers to comply with the agency's general environmental specifications, such as those for sanitation, waste disposal, vermin control, and accident prevention.  29 C.F.R. §§ 1910.141 to .142.

12

45.     OSHA requires employers to comply with the agency's specifications regarding the design, application, and use of accident prevention signs and symbols. 29 C.F.R. §§ 1910.145, 1926.200.

46.     OSHA requires employers that are not in "near proximity" to hospitals to have trained personnel available "to render first aid."  29 C.F.R. § 1910.151(b). OSHA also requires that "[a]dequate first aid supplies . . . be readily available."  *Id.*

47.     OSHA requires employers to make available to employees "suitable facilities for quick drenching or flushing of the eyes and body."  29 C.F.R. § 1910.151(c).

48.     OSHA requires employers to comply with the agency's specifications regarding compressed air receivers.  29 C.F.R. § 1910.169.

49.     OSHA requires employers to comply with the agency's specifications regarding the handling, storage, and "[h]ousekeeping" of workplace materials.  29 C.F.R. §§ 1910.176, 1926.25.

50.     OSHA requires employers to conform their use of trucks—including "fork trucks, tractors, platform lift trucks, motorized hand trucks, and other specialized industrial trucks powered by electric motors or internal combustion engines"—to the agency's specifications.  29 C.F.R. § 1910.178.

51.     OSHA requires employers to comply with the agency's specifications for "overhead and gantry cranes."  29 C.F.R. § 1910.179.

52.     OSHA requires employers to comply with the agency's specifications for the use of crawler locomotive and truck cranes.  29 C.F.R. § 1910.180.

13

53.     OSHA requires employers to comply with the agency's specifications for the use of derricks.  29 C.F.R. § 1910.181.

54.     OSHA requires employers to properly utilize and daily inspect all slings used for moving materials in the workplace.  29 C.F.R. § 1910.184.

55.     OSHA requires employers to comply with the agency's specifications for the use of machinery.  29 C.F.R. §§ 1910.211 to .219.

56.     OSHA requires employers to properly install guarding on all machinery "to protect the operator and other employees in the machine area from hazards," and to anchor machines that are designed to be in a fixed location.  29 C.F.R. § 1910.212.

57.     OSHA requires employers to comply with the agency's specifications for woodworking machines, including hand-fed ripsaws, table saws, circular saws, swing cutoff saws, radial saws, jointers, tenoning machines, boring machines, wood shapers, swing-head lathes, and sanding machines.  29 C.F.R. § 1910.213.

58.     OSHA requires employers to comply with the agency's specifications for abrasive wheel machinery, including bench and floor grinding machines, cylindrical grinders, surface grinders, swing frame grinders, and automatic snagging machines.  29 C.F.R. § 1910.215.

59.     OSHA requires employers to comply with the agency's specifications for the use of power-transmission belts.  29 C.F.R. § 1910.219.

14

60.     OSHA requires employers to maintain and use all hand and power tools in accordance with the agency's specifications.  29 C.F.R. §§ 1910.241 to .244, 1926.300.

61.     OSHA requires employers to take numerous precautions related to fire prevention, personal protection, and ventilation before conducting any welding or cutting.  29 C.F.R. §§ 1910.251 to .255.

62.     OSHA requires employers to ensure that its electrical systems are designed in conformity with the agency's specifications, and to maintain and use electrical systems and equipment in conformity with the agency's specifications.  29 C.F.R. §§ 1910.303 to .305, 1926.403 to .405.

63.     OSHA requires employers to provide training to "employees who face a risk of electric shock" in the workplace.  29 C.F.R. § 1910.332.

64.     OSHA requires employers to adopt "safety-related work practices" for both "qualified" and "unqualified" persons and to take specified precautions "to prevent electric shock or other injuries resulting from either direct or indirect electrical contacts, when work is performed near or on equipment or circuits which are or may be energized."  29 C.F.R. §§ 1910.331 to .335.

65.     OSHA requires employers to comply with safety specifications governing safety belts, lifelines, lanyards, and safety nets.  29 C.F.R. §§ 1926.104 to .105.

15

## IV.    OSHA's Abusive and Arbitrary Enforcement of the OSH Act

66.    OSHA has a lengthy history of abusive and arbitrary enforcement of the OSH Act.  Because Congress delegated to OSHA its power to write the law so broadly, and with practically no constraints, agency inspectors have extraordinary power to fine employers for any conduct that they might consider to pose a risk of a workplace injury.  To maximize its enforcement power, the agency has every incentive to write sweepingly broad safety rules that provide little clarity to regulated businesses but can later be enforced in whatever particular way the agency sees fit.  This "know-it-when-you-see it" method of enforcement highlights the danger of arbitrary enforcement that flows from the OSH Act's overbroad delegation of legislative authority.

67.    OSHA enforcement is not a rare occurrence for employers, and fining employers is a lucrative enterprise.  In fiscal year 2019, for example, OSHA issued more than 40,490 citations, with penalties totaling $142,197,445.  OSHA, *Industry Profile for OSHA Standard ALL*, U.S. Dep't of Labor, https://www.osha.gov/pls/imis/industryprofile.stand?p_esize=&p_stand=Total&p_state=FEFederal&p_type=2 (last visited Sept. 27, 2021).  Over the same period, OSHA issued more than 20,000 citations to individuals in the construction industry, with penalties totaling almost $70,000,000.  *See id.*

68.    OSHA also frequently inspects workplaces to identify violations of the OSH Act and safety standards.  In fiscal year 2019, OSHA conducted 18,493 unprogrammed inspections and 14,900 programmed inspections.  OSHA,

16

*Occupational Safety and Health Administration (OSHA) Enforcement*, U.S. Dep't of Labor, https://www.osha.gov/enforcement/2020-enforcement-summary (last visited Sept. 27, 2021).  OSHA has even invited union representatives to participate in workplace inspections.  *See, e.g.*, *NFIB v. Dougherty*, No. 16-CV-2568-D, 2017 WL 1194666, at *2 (N.D. Tex. Feb. 3, 2017).

69.     OSHA also has used threats to impose safety measures that go beyond existing law.  In 1999, OSHA issued a directive threatening to increase inspections of employers that did not enact a comprehensive safety and health program designed to meet standards that exceed those required by existing law.  The D.C. Circuit concluded that the directive violated the Administrative Procedure Act. *Chamber of Com. of U.S. v. U.S. Dep't of Lab.*, 174 F.3d 206 (D.C. Cir. 1999).

70.     In 2006, OSHA attempted to fine an employer for an alleged failure to record workplace injuries that occurred outside the statute of limitations Congress prescribed in the OSH Act.  The D.C. Circuit held that this effort was untimely and invalidated OSHA's citation against the employer.  *See AKM LLC v. Sec'y of Lab.*, 675 F.3d 752 (D.C. Cir. 2012).  OSHA later promulgated a regulation purporting to adopt its preferred limitations period, but Congress disapproved that regulation under the Congressional Review Act.  *See* Pub. L. No. 115-21, 131 Stat. 87 (2017).

71.     In 2010, OSHA fined SeaWorld $70,000 after a killer whale caused the death of a trainer during a performance.  Then-Judge Kavanaugh observed that OSHA had "stretch[ed] its general authority under the Act" in a way "that effectively bans SeaWorld from continuing a longstanding and popular (albeit by

definition somewhat dangerous) show in which SeaWorld trainers play with and interact with whales." *SeaWorld of Fla., LLC v. Perez*, 748 F.3d 1202, 1218 (D.C. Cir. 2014) (Kavanaugh, J., dissenting).  He explained that OSHA's "unprecedented assertion of authority" in an enforcement action was "triply flawed" because it "departs from longstanding administrative precedent," "irrationally and arbitrarily distinguishes" among other dangerous activities, and "green-lights the Department to regulate sports and entertainment activities in a way that Congress could not conceivably have intended in 1970 when giving the agency general authority to ensure safer workplaces."  *Id.*  He also highlighted the risk of OSHA "treating similar cases dissimilarly, the paradigmatic arbitrary and capricious agency action." *Id.* at 1221.

## V.   Allstates Refractory Contractors, LLC

72.   Allstates is a full-service industrial process general contractor serving the glass, metals, and petrochemical industries in Toledo, Ohio, and elsewhere around the country.  Allstates was founded in 1995 to offer refractory lining services to metals manufacturers.  As a result of hard work and by focusing on client relationships, Allstates was able to expand its reach into other important industries, including the glass industry.  Today, Allstates is a "one-stop-shop" offering complete furnace services including consultation, repair, installation, retrofitting, and rebuilding.  Allstates has the NAICS code 23899, for specialty trade contractors.

73.     Generally, Allstates does not perform work on federal property, on public works, or pursuant to a contract with the federal government.  Further, to the best of Allstates' knowledge, it does not perform work pursuant to contracts financed by loans or grants from the federal government.

74.     Allstates currently has four full-time employees and many part-time employees.  Allstates hires additional part-time employees as needed for each job— sometimes up to 100 employees, depending on the size and scope of the job.

75.     Allstates is committed to protecting the safety of its workers on every job.  One measure of safety used by OSHA is the Total Reportable Incident Response ("TRIR") rate, which measures the total number of OSHA recordable work-related injuries or illness that occur over the course of 200,000 worker hours.  *See* Interpretation Ltr. from Amanda Edens, Director, Directorate of Technical Support and Emergency Management, OSHA, to Big Sky Industrial (Aug. 23, 2016), https://tinyurl.com/ptt8923y; *see also* 29 C.F.R. § 1904.4 (outlining criteria for when an injury is recordable).  Allstates' TRIR rate is 0.0, which means that it has not experienced a recordable work-related injury over the last 200,000 employee hours worked.  *See Health and Safety News*, Allstates Refractory Contractors,, https://allstatesrefractory.com/news/health-safety (last visited Sept. 27, 2021).  This feat is all the more impressive given the amount of time it takes for Allstates to accumulate 200,000 employee hours due to its small number of employees.  Indeed, OSHA itself has recognized that "[a] single injury or illness has a much greater effect on incidence rates in small establishments than on larger establishments."

19

*See* Interpretation Ltr. from Amanda Edens, *supra*.  What is more, the TRIR rate affects a contractor's competitiveness, as businesses take the rate into account when selecting contractors, despite the fact that a single injury can drastically skew a small business's incidence rate, thereby making a small business less competitive than a larger one.  Although the TRIR standard unfairly handicaps small businesses when compared to their larger competitors, Allstates has been especially vigilant in ensuring that its employees are working in safe conditions.

76.     Another measure of safety is a business's experience modification rate ("EMR"), which is a statistic used by insurance companies to determine the likelihood that a business will experience a worker's compensation claim.  *See Experience Modification Rate & Workers' Comp*, AmTrust Financial, https://tinyurl.com/a99x6aay (last visited Sept. 27, 2021).  An EMR below 1.0 means that the company is considered safer than most others in the industry.  *See id.* Allstates' EMR is .43.  *See Health and Safety News*, *supra*.

## STANDING

77.     Allstates has standing to challenge the facial constitutionality of Section 6(b) of the OSH Act because (a) it is suffering injuries in fact (b) that are fairly traceable to Section 6(b) of the OSH Act, and (c) the Court can redress Allstates' injuries by declaring Section 6(b) of the OSH Act unconstitutional and enjoining Defendants from enforcing Section 6(b) through Sections 5(a)(2) and 17 of the OSH Act, which subject Allstates to civil and criminal penalties for non-compliance.

78.     When "the plaintiff is himself an object of the action," "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992); *see also Patel v. CIS*, 732 F.3d 633, 638 (6th Cir. 2013) (plaintiff had standing to challenge CIS visa denial); *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (Kavanaugh, J.) (plaintiff had standing to challenge CFPB's constitutional structure because it was directly regulated by CFPB).

79.     Allstates is the object of the OSH Act because it is an employer "engaged in a business affecting commerce who has employees," 29 U.S.C. § 652(5), that must "comply with occupational safety and health standards promulgated under this chapter," *id.* § 654(a)(2).  Allstates has worked, and will continue to work, on jobs for which it must comply with the OSH Act.

80.     The OSH Act injures Allstates by mandating that Allstates comply with burdensome safety standards.  "An increased regulatory burden typically satisfies the injury in fact requirement." *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (quoting *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015)); *see also Contender Farms*, 779 F.3d at 266 (finding harm because plaintiffs "must take additional measures to avoid even the appearance of [regulatory violations]," must "agree to the new procedures" before participating in the market, and must "forfeit their rights" under the previous regulatory scheme).

21

81.     Allstates has in the past spent time and money complying with the OSH Act's statutory mandate, and Allstates currently spends time and money complying with the OSH Act.  The additional costs associated with complying with the OSH Act are a burden on Allstates because it must divert resources from other business activities to pay those costs.  *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 261–62 (6th Cir. 2009) (holding that "the cost of compliance" with challenged federal requirements is "a cognizable injury in fact"); *see also State Nat'l Bank of Big Spring*, 795 F.3d at 53 (plaintiff had standing because agency rule caused bank to "incur costs to ensure that they are properly complying with" the rule).

82.     Despite its outstanding track record of workplace safety, Allstates is forced to spend more money than it otherwise would in order to comply with the OSH Act's statutory mandate to follow OSHA's safety standards.  Specifically, Allstates must comply with OSHA's safety standards, and it must ensure that its employees comply with OSHA's standards on each job.  These costs impose financial and regulatory burdens on Allstates.

83.     Complying with the OSH Act also imposes additional personnel costs on Allstates.  Allstates must pay a full-time employee to be responsible for OSHA compliance.  In addition, Allstates must pay supervisors to inspect worksites and ensure that workers comply with OSHA standards on each job site.  Supervisors must be familiar with—and able to interpret and apply—OSHA standards on each job site.  Allstates spends thousands of dollars each year paying employees to

22

ensure compliance with OSHA safety standards.  OSHA compliance increases the costs of each job because Allstates loses money every time it delays, pauses, or prolongs a job to comply with OSHA's safety standards.

84.     Complying with the OSH Act similarly imposes training costs on Allstates.  Allstates spends time and money training each employee to comply with OSHA standards before starting each job.  For example, Allstates pays each employee to take a two-hour safety training course before each job.  Allstates also pays for each full-time employee to take a ten-hour safety course every year. Allstates spends thousands of dollars each year training its employees to comply with OSHA standards.

85.     Complying with the OSH Act imposes numerous other compliance costs on Allstates.

86.     For example, Allstates must comply with standards governing fall protection on each job.  29 C.F.R. pt. 1926, subpart M (1926.501 to .503); 29 C.F.R. pt. 1926, subpart R (1926.759 to .761); 29 C.F.R. pt. 1910, subpart D (1910.28 to .30); 29 C.F.R. pt. 1910, subpart I (1910.140).  Allstates spends money to provide employees with fall protection systems that comply with OSHA's requirements and to secure all materials, equipment, and tools against accidental displacement. Allstates also spends money to provide a training program for each employee who might be exposed to fall hazards.  Complying with OSHA's standards governing fall protection is burdensome given the nature of Allstates' work in high-heat environments.

23

87.     Allstates must comply with standards governing electrical safety on each job.  29 C.F.R. pt. 1910, subpart S (1910.302 to .399); 29 C.F.R. pt. 1910, subpart J (1910.147); 29 C.F.R. pt. 1926, subpart K (1926.400 to .449).  For example, Allstates spends money complying with OSHA's lockout/tagout standard on each job.  Allstates also spends money to provide a training program for each employee who might be exposed to electrical hazards, including with respect to power tools and extension cords.

88.     Allstates must comply with standards governing the use of scaffolds on each job.  29 C.F.R. pt. 1926, subpart L (1926.450 to .454); 29 C.F.R. pt. 1910, subpart D (1910.27).  Allstates spends money to provide employees with scaffolds that comply with OSHA's requirements.  Allstates also spends money to provide a training program for each employee who might perform work on a scaffold and to train supervisors to be able to perform daily inspections and erect scaffolding.

89.     Allstates must comply with standards governing cranes, derricks, forklifts, and rigging equipment on each job.  29 C.F.R. pt. 1926, subpart CC (1926.1400 to .1443).  Allstates spends money to provide employees with cranes, derricks, forklifts, and rigging equipment that comply with OSHA's requirements. Allstates also spends money to provide a training program for each employee who might perform work on a crane, derrick, forklift, and rigging equipment.

90.     Allstates must comply with standards governing personal protective equipment on each job.  29 C.F.R. pt. 1910, subpart I (1910.132 to .140); 29 C.F.R. pt. 1926, subpart E (1926.95 to .107).  Allstates spends money to provide employees

24

with personal protective equipment that complies with OSHA's requirements. Allstates also spends money on testing and training regarding the proper application and use of personal protective equipment.

91. Allstates must comply with standards governing fire protection on each job. 29 C.F.R. pt. 1910, subpart L (1910.155 to .165); 29 C.F.R. pt. 1926, subpart C (1926.24); 29 C.F.R. pt. 1926, subpart F (1926.150 to .159). Allstates spends money developing and maintaining fire prevention programs and providing employees with firefighting equipment and fire detection systems. Allstates also spends money training employees on the inspection and proper use of this equipment.

92. Allstates must comply with standards governing confined spaces on each job. 29 C.F.R. pt. 1926, subpart AA (1926.1201 to .1213); 29 C.F.R. pt. 1910, subpart J (1910.146). Allstates spends money to provide a training program for each employee who might perform work in confined spaces, and to implement all aspects of its confined space program.

93. Allstates must comply with standards governing walking-working surfaces on each job. 29 C.F.R. pt. 1910, subpart D (1910.21 to .30); 29 C.F.R. pt. 1926, subpart X (1926.1051 to .1053). Allstates spends money ensuring that all places of employment, passageways, storerooms, service rooms, and walking-working surfaces are kept in a clean, orderly, and sanitary condition. Allstates also spends money inspecting walking-working surfaces to ensure they are maintained

in a safe condition.  Allstates spends money to provide employees with ladders, catwalks, and walkways that comply with OSHA's requirements.

94.     Allstates must comply with standards governing hand and power tools on each job.  29 C.F.R. pt. 1926, subpart I (1926.300 to .307); 29 C.F.R. pt. 1910, subpart P (1910.241 to .244).  Allstates spends money to provide employees with safety guards for hand and power tools.  Allstates also spends money training employees on OSHA's prescribed method of using hand and power tools.

95.     These numerous examples are only a fraction of the vast universe of OSHA safety standards for which Allstates must spend money to ensure that it and its employees are OSHA compliant, as mandated by the OSH Act.

96.     Allstates intends to continue working on similar jobs subject to the OSH Act in the future, and Allstates intends to continue performing the same type of work.  In particular, Allstates has jobs lined up over the next few months on which it must comply with the OSH Act.  Allstates will thus spend additional time and money complying with the OSH Act in the future.

97.     Allstates' work is affected with a constitutional interest because the Constitution's structure "protects the liberty of the individual from arbitrary power. When government acts in excess of its lawful powers, that liberty is at stake." *Bond v. United States*, 564 U.S. 211, 222 (2011).

98.     The OSH Act applies to these jobs because Allstates is an employer engaged in a business affecting commerce that is subject to the OSH Act.  The OSH Act authorizes OSHA to regulate every aspect of these jobs—from fall protection to

26

personal protective equipment.  Indeed, OSHA's prior enforcement action against Allstates shows that Allstates' work is subject to the OSH Act.  *See infra* ¶ 102.

99.    The OSH Act regulates the manner in which Allstates must do its work and eliminates Allstates' discretion to choose how best to keep its employees safe.  In particular, the OSH Act prohibits Allstates from working on jobs without complying with OSHA's occupational safety standards and exposes Allstates to criminal and civil penalties if it fails to comply, even if Allstates implements its own safety measures that are as effective—or even more effective—at protecting worker safety in the circumstances than the OSHA standards.

100.    Allstates faces a substantial risk of enforcement if it fails to comply with the OSH Act in the future.  Indeed, Allstates risks civil and criminal penalties under the OSH Act if it fails to comply with any of OSHA's safety standards.  29 U.S.C. § 666.

101.    OSHA has a history of aggressively enforcing the OSH Act against employers generally and employers in the construction industry specifically.

102.    OSHA has a history of enforcing the OSH Act against Allstates in particular.  For example, in October 2019, OSHA cited Allstates for violating the standards governing hand and power tools, 29 C.F.R. § 1926.300, and fined Allstates more than $10,000 for violating standards governing falling-object protection, 29 C.F.R. § 1926.759, after an employee was injured on a job in Pennsylvania when a catwalk brace fell and injured a worker below.  Allstates was not working on a contract with the federal government, working on federal

property, working on a public works project, or working on a contract funded by federal loans or grants when it received these two citations.  Allstates does not challenge the fine or citation in this lawsuit.

103.    OSHA has not disavowed enforcing the OSH Act against Allstates in the future.  OSHA often inspects the jobs involving Allstates.

104.    The White House has announced that OSHA will step up enforcement against employers—like Allstates—that work in high-heat environments.  The White House, *FACT SHEET: Biden Administration Mobilizes to Protect Workers and Communities from Extreme Heat* (Sept. 20, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/20/fact-sheet-biden-administration-mobilizes-to-protect-workers-and-communities-from-extreme-heat/.  The President's directive shows that OSHA's enforcement decisions are not being made on an objective review of compliance with existing objective legal text, but instead are being made due to a political directive from the President to step up enforcement.

105.    Based on OSHA's prior enforcement action, Allstates' fear of another OSHA enforcement action in the future compels Allstates to continue spending time and money to ensure its compliance with the OSH Act.

106.    Allstates faces a substantial risk of OSHA enforcement for failing to comply with the OSH Act.  The threat to Allstates is real and severe because OSHA imposed a fine against Allstates in the past.  Indeed, there is a substantial risk that OSHA will bring an enforcement action against Allstates if it inadvertently fails to comply with the OSH Act.  OSHA has done so in the past, and there is a substantial

risk that OSHA will do so in the future.  If OSHA brings another enforcement action, Allstates will be forced to divert significant time and resources to respond to OSHA—not to mention the substantial risk of criminal and civil penalties for failing to comply with the OSH Act.

107.   Allstates does not have to show that it "will in fact violate" any occupational safety standard to have standing "to challenge the constitutionality of" the OSH Act.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014).  Nor must Allstates "bet the farm" by waiting for an enforcement action to raise its constitutional challenge.  *Free Enter. Fund*, 561 U.S. at 490.

108.   But for the OSH Act, Allstates would exercise its discretion not to comply with certain OSHA safety standards in settings in which Allstates determines that complying with those standards would be impractical, impossible, or unsafe.  In high-heat environments, for example, it is unsafe for Allstates to comply with OSHA's standards governing fall protection, confined spaces, and rigging because workers are exposed to a great risk of exposure to heat.  When workers comply with these standards while exposed to high temperatures, there is a risk that workers will not be able to move quickly enough to avoid injury from the heat.  Allstates would not comply with these standards in certain settings if it had the discretion not to do so, because Allstates would take alternative steps to ensure worker safety.

109.   Allstates' injuries are traceable to the legislative delegation of power in Section 6(b) of the OSH Act.  In the absence of Congress's delegation of legislative

authority to the Secretary in Section 6(b), the Secretary could not promulgate occupational safety standards under Section 6(b), and Allstates would not have to spend time and money complying with any occupational safety standards issued under Section 6(b), face the substantial risk of an OSHA enforcement action, or be exposed to civil and criminal penalties for non-compliance.

110.     This Court can redress Allstates' injuries by declaring that Section 6(b) of the OSH Act violates Article I of the Constitution and enjoining the Secretary and his subordinates from enforcing Sections 5(a)(2) and 17 of the OSH Act.  That injunction against enforcement of the statutory mandate would relieve Allstates of its obligation to comply with OSHA's safety standards issued under Section 6(b) and prevent OSHA from imposing civil and criminal penalties for non-compliance.

**CLAIM FOR RELIEF**

**Violation of the Separation of Powers**
**Section 6(b) of the OSH Act Violates Article I of the U.S. Constitution**

111.     Allstates incorporates by reference the allegations contained in all of the preceding paragraphs as though set forth fully herein.

112.     Allstates' cause of action is "an implied private right of action directly under the Constitution to challenge governmental action under … separation-of-powers principles." *Free Enter. Fund*, 561 U.S. at 491 n.2.  This Court has inherent equitable power to enjoin federal officials from enforcing an unconstitutional law. *Id.*  "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 141 S. Ct. 1761, 1780 (2021).

30

113.   Section 6(b) of the OSH Act violates the nondelegation doctrine in Article I of the Constitution by delegating legislative power to the Secretary of Labor to make "reasonably necessary" or "appropriate" health and safety rules without providing any intelligible principle about what is "reasonably necessary" or "appropriate."

114.   Section 5(a)(2) of the OSH Act impermissibly requires employers to comply with OSHA standards promulgated pursuant to Section 6(b) in violation of the nondelegation doctrine.

115.   Section 17 of the OSH Act impermissibly imposes civil and criminal penalties on employers for failing to comply with the statutory mandate to follow OSHA safety standards promulgated pursuant to Section 6(b) in violation of the nondelegation doctrine.

## PRAYER FOR RELIEF

Wherefore, Allstates prays for the following relief:

1.   A declaration that Section 6(b) of the OSH Act violates Article I of the Constitution;

2.   An order enjoining Defendants from enforcing Sections 5(a)(2) and 17 of the OSH Act against employers, to the extent such enforcement is predicated on Section 6(b);

3.   An award of all costs and attorneys' fees pursuant to any applicable statute or authority; and

4.   Any other relief this Court deems just and proper.

Dated:  September 30, 2021                    Respectfully submitted,


_/s/ Christopher M. McLaughlin_
Christopher M. McLaughlin (0078186)
Email:  cmmclaughlin@jonesday.com
JONES DAY
North Point, 901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Brett A. Shumate (_pro hac vice_ to follow)
Email:  bshumate@jonesday.com
John M. Gore (_pro hac vice_ to follow)
Email:  jmgore@jonesday.com
Anthony J. Dick (_pro hac vice_ to follow)
Email:  ajdick@jonesday.com
J. Benjamin Aguiñaga (_pro hac vice_ to follow)
Email:  jbaguinaga@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

_Counsel for Plaintiff Allstates Refractory Contractors, LLC_

32