# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| ALLSTATES REFRACTORY CONTRACTORS, LLC, <br><br>        *Plaintiff,* <br><br>     *v.* <br><br> MARTIN J. WALSH, in his official capacity as Secretary of Labor, *et al.,* <br><br>       *Defendants.* | No. 3:21-cv-01864-JZ |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## <u>MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS .......................................................... 4

    A.    Statutory and Regulatory Background ..................................................... 4

            1.    *The Occupational Safety and Health Act* ........................................ 4

            2.    *OSHA Standards* ........................................................................... 4

            3.    *OSHA Practice* ............................................................................. 7

    B.    Allstates Refractory Contractors, LLC ..................................................... 7

STANDARD OF REVIEW ..................................................................................... 9

ARGUMENT .......................................................................................................... 10

I.    Congress's Delegation of Authority to Write "Reasonably Necessary or Appropriate" Safety Standards Violates Article I of the Constitution ............ 10

    A.    The Delegation Here Lacks an Intelligible Principle ................................ 10

            1.    *The Intelligible Principle Test* ...................................................... 10

            2.    *The Absence of an Intelligible Principle Here* ............................ 14

            3.    *OSHA's Prior Defenses of this Delegation* .................................. 18

                    a.    *Self-Imposed Limitations* .................................................... 19

                    b.    *Statutory Construction* ........................................................ 21

    B.    If the Delegation Here Supplies an Intelligible Principle, the Intelligible Principle Test Should Be Reconsidered ................................ 24

II.    This Court Should Enter Declaratory and Injunctive Relief .......................... 26

CONCLUSION ........................................................................................................ 28

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) ............................................................. 13, 14, 16, 18

*AKM LLC v. Sec'y of Lab.,*
675 F.3d 752 (D.C. Cir. 2012) ................................................................ 2

*Alabama Ass'n of Realtors v. HHS,*
141 S. Ct. 2485 (2021) ........................................................................ 27

*Am. Power & Light Co. v. SEC,*
329 U.S. 90 (1946) ............................................................................. 12

*Am. Textile Mfrs. Inst. v. Donovan,*
452 U.S. 490 (1981) ...................................................................*passim*

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ............................................................................. 9

*Ayestas v. Davis,*
138 S. Ct. 1080 (2018) ....................................................................... 15

*Bowsher v. Synar,*
478 U.S. 714 (1986) ........................................................................... 10

*BST Holdings, LLC v. OSHA,*
17 F.4th 601 (5th Cir. 2021) .................................................................. 2

*eBay Inc. v. MercExchange, LLC,*
547 U.S. 388 (2006) ........................................................................... 10

*Free Enter. Fund v. PCAOB,*
561 U.S. 477 (2010) ........................................................................... 26

*Freeman v. Quicken Loans, Inc.,*
566 U.S. 624 (2012) ........................................................................... 23

*Gundy v. United States,*
139 S. Ct. 2116 (2019) ..................................................... 11, 16, 24, 25

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.,*
448 U.S. 607 (1980) ...................................................................*passim*

*Int'l Union v. OSHA,*
37 F.3d 665 (D.C. Cir. 1994) ......................................................... 20, 22

*Int'l Union v. OSHA,*
938 F.2d 1310 (D.C. Cir. 1991) ....................................................*passim*

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*J.W. Hampton, Jr., & Co. v. United States*,
276 U.S. 394 (1928) ............................................................................ 11, 12

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ................................................................. 15

*Michigan v. EPA*,
576 U.S. 743 (2015) .................................................................................. 15

*Nat'l Maritime Safety Ass'n v. OSHA*,
566 U.S. 936 (2012) .................................................................................. 21

*Nat'l Maritime Safety Ass'n v. OSHA*,
649 F.3d 743 (D.C. Cir. 2011) ................................................................. 21

*NFIB v. Dougherty*,
No. 16-cv-2568-D, 2017 WL 1194666 (N.D. Tex. Feb. 3, 2017) ............ 2

*Panama Refin. Co. v. Ryan*,
293 U.S. 388 (1935) ............................................................................ 12, 13

*Paul v. United States*,
140 S. Ct. 342 (2019) .......................................................................... 24, 25

*SeaWorld of Fla., LLC v. Perez*,
748 F.3d 1202 (D.C. Cir. 2014) ................................................................. 2

*Tanzin v. Tanvir*,
141 S. Ct. 486 (2020) ................................................................................ 15

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) .................................................................................. 27

*Tiger Lily, LLC v. HUD*,
5 F.4th 666 (6th Cir. 2021) ....................................................................... 11

*Touby v. United States*,
500 U.S. 160 (1991) .................................................................................. 12

*Vitolo v. Guzman*,
999 F.3d 353 (6th Cir. 2021) ............................................................. 26, 27

*Wayman v. Southard*,
23 U.S. (10 Wheat.) 1 (1825) ................................................................... 25

*Whitman v. Am. Trucking Assn's*,
531 U.S. 457 (2001) ........................................................................*passim*

*Wilson v. Williams*,
961 F.3d 829 (6th Cir. 2020) .................................................................... 10

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Winter v. NRDC,*
  555 U.S. 7 (2008) ................................................................ 9

*Yakus v. United States,*
  321 U.S. 414 (1944) ...................................................... 12, 18

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const. art. I .......................................................... 10, 22

28 U.S.C. § 2201 .................................................................. 9

28 U.S.C. § 2202 .................................................................. 9

28 U.S.C. § 2461 .............................................................. 2, 4

29 U.S.C. § 651 ............................................................. 22, 24

29 U.S.C. § 652 ...........................................................*passim*

29 U.S.C. § 654 .............................................................. 3, 4

29 U.S.C. § 655 ...........................................................*passim*

29 U.S.C. § 666 ....................................................... 2, 3, 4, 14

29 U.S.C. § 668 .................................................................. 4

**OTHER AUTHORITIES**

29 C.F.R. § 1910.132 ............................................................ 7

29 C.F.R. § 1910.146 ............................................................ 7

29 C.F.R. § 1910.147 ............................................................ 7

29 C.F.R. § 1926.451 ............................................................ 7

29 C.F.R. § 1926.501 ............................................................ 7

29 C.F.R. § 1926.503 ............................................................ 7

Amy Coney Barrett, *Suspension and Delegation*,
  99 Cornell L. Rev. 251 (2014) .......................................... 25

Control of Hazardous Energy Sources (Lockout/Tagout),
  54 Fed. Reg. 36,644 (Sept. 1, 1989) ................................... 19

Control of Hazardous Energy Sources (Lockout/Tagout),
  58 Fed. Reg. 16,612 (Mar. 30, 1993) ............................. 20, 22

Delegation of Authority and Assignment of Responsibility to the
  Assistant Secretary for Occupational Safety and Health,
  85 Fed. Reg. 58,393 (Sept. 18, 2020) ................................... 4

iv

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Fed. R. Civ. P. 56 ............................................................................... 9

Fed. R. Civ. P. 57 ............................................................................... 9

Heat Injury and Illness Prevention in Outdoor and Indoor Work Settings,
   86 Fed. Reg. 59,309 (Oct. 27, 2021) ........................................... 9

OSHA, *Industry Profile for OSHA Standard ALL*, U.S. Dep't of Labor
   (Industry Profile) ........................................................................ 2, 7

OSHA, *Occupational Safety and Health Administration (OSHA)
   Enforcement*, U.S. Dep't of Labor ............................................. 2, 7

OSHA, *Top 10 Most Frequently Cited Standards for Fiscal Year 2020* .................. 7

Cass. R. Sunstein, *Is OSHA Unconstitutional?*,
   94 Va. L. Rev. 1407 (2008) ............................................................. 1

U.S. Dep't of Labor, *2021 Annual Adjustments to OSHA Civil Penalties*
   (Jan 8, 2021) ............................................................................. 2, 4

The White House, *FACT SHEET: Biden Administration Mobilizes to
   Protect Workers and Communities from Extreme Heat* (Sept. 20,
   2021) .............................................................................................. 9

v

## INTRODUCTION

This case concerns a delegation of extraordinary legislative power to one of the most consequential and far-reaching federal agencies in the modern era. The Occupational Safety and Health Act (the Act) empowers the Occupational Safety and Health Administration (OSHA) to issue "any occupational safety or health standard" regulating nearly every workplace in the United States. 29 U.S.C. § 655(b). When it comes to workplace-safety standards, the only purported limit on that broad rulemaking authority is that these rules must be "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." *Id.* § 652(8). But in reality that is no limit at all. The Act sheds no light on what makes a rule "reasonably necessary or appropriate." Instead it leaves that weighty policy question entirely to the unbridled discretion of the agency. OSHA has been quite candid about this, telling the Supreme Court that "[t]he phrase 'reasonably necessary or appropriate' is not a limitation on [its] powers." Br. for the Federal Parties at 43, *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607 (1980) (*Benzene*) (Nos. 78-911, 78-1036), 1979 WL 199556 (OSHA *Benzene* Br.). As one commentator aptly observed, "[n]o other federal regulatory statute confers so much discretion on federal administrators, at least in any area with such broad scope." Cass. R. Sunstein, *Is OSHA Unconstitutional?*, 94 Va. L. Rev. 1407, 1448 (2008).

Armed with this legislative power, OSHA has issued various safety standards governing the nation's workplaces in striking detail. In addition to writing this burdensome code, OSHA aggressively enforces it against employers across the

country, including here in Ohio. The Act threatens violators of the agency's safety standards with civil penalties up to $136,532 per infraction, and OSHA has not been shy about imposing such fines. 29 U.S.C. § 666; *see* 28 U.S.C. § 2461 note (providing for adjustments to civil penalties based on inflation); U.S. Dep't of Labor, *2021 Annual Adjustments to OSHA Civil Penalties* (Jan 8, 2021) (OSHA Penalties), https:// bit.ly/31cdlip (setting forth current penalties). In fiscal year 2020, OSHA conducted over 21,000 inspections, issued over 36,000 citations, and imposed over $136 million in penalties. OSHA, *Occupational Safety and Health Administration (OSHA) Enforcement*, U.S. Dep't of Labor (OSHA Enforcement), https://bit.ly/3Blmcdr (last visited Dec. 3, 2021); OSHA, *Industry Profile for OSHA Standard ALL*, U.S. Dep't of Labor (Industry Profile), https://bit.ly/2Zq3GUg (last visited Dec. 3, 2021).

Unsurprisingly, OSHA's power to make and enforce its own rules has often proved arbitrary and abusive. *See SeaWorld of Fla., LLC v. Perez*, 748 F.3d 1202 (D.C. Cir. 2014) (effectively banning whale show at SeaWorld); *AKM LLC v. Sec'y of Lab.*, 675 F.3d 752 (D.C. Cir. 2012) (filing enforcement action outside the statute of limitations); *NFIB v. Dougherty*, No. 16-cv-2568-D, 2017 WL 1194666 (N.D. Tex. Feb. 3, 2017) (inviting unions to participate in workplace inspections). As then-Judge Kavanaugh explained, OSHA has enforced the Act beyond the limits of its authority and arbitrarily "treat[ed] similar cases dissimilarly." *SeaWorld*, 748 F.3d at 1218 (dissenting). More recently, the agency's COVID-19 vaccine mandate (issued under a separate provision not challenged here) was immediately stayed on the ground that it "grossly exceeds OSHA's statutory authority." *BST Holdings, LLC v. OSHA*, 17

2

F.4th 601, 605 (5th Cir. 2021). That case is now pending before the Sixth Circuit. *See In re OSHA Rule On COVID-19 Vaccination and Testing*, No. 21-7000.

By endowing OSHA with such unfettered authority to make whatever rules about workplace safety that it deems appropriate, Congress ran afoul of the Constitution's separation of powers. Article I of the Constitution vests all legislative power exclusively in Congress, which means that Congress may not delegate such power to the Executive Branch. Yet that is what the Act does. Despite authorizing OSHA to legislate—and enforce—a code of laws governing almost every American workplace, Congress left the agency with no constraints over its discretion other than that its standards be "reasonably necessary or appropriate." Far from providing an intelligible principle, this language leaves OSHA effectively unconstrained, and it has predictably resulted in arbitrary and abusive enforcement.

This Court should grant Allstates declaratory and injunctive relief to remedy this constitutional violation. Specifically, this Court should declare that Congress's delegation of authority to OSHA to promulgate "any occupational safety or health standard" that the agency deems "reasonably necessary or appropriate to provide safe or healthful employment and places of employment" is unconstitutional. 29 U.S.C. §§ 652(8), 655(b). It should also enjoin the government from enforcing the statutory mandate to comply with safety rules issued under this unconstitutional delegation. *See id.* §§ 654(a)(2), 666. If the separation of powers means anything, it is that Congress cannot authorize the Executive Branch both to decide what workplace safety rules are "appropriate" and to enforce them on pain of six-figure penalties.

## STATEMENT OF UNDISPUTED FACTS

### A.    Statutory and Regulatory Background

#### 1.    *The Occupational Safety and Health Act*

Enacted in 1970, the Occupational Safety and Health Act provides that the Secretary of Labor "may by rule promulgate, modify, or revoke any occupational safety or health standard." 29 U.S.C. § 655(b). The Secretary has delegated that power to OSHA. *See* Delegation of Authority and Assignment of Responsibility to the Assistant Secretary for Occupational Safety and Health, 85 Fed. Reg. 58,393 (Sept. 18, 2020).

The Act mandates that every "employer" must "comply with occupational safety and health standards promulgated" by OSHA. 29 U.S.C. § 654(a)(2). Under the Act, an "employer" is any "person engaged in a business affecting commerce who has employees," with an exception for state and local governments. *Id.* § 652(5); *see id.* § 668(a) (requiring all federal agencies to adhere to OSHA's standards).

Employers who violate OSHA's standards are subject to a variety of civil and criminal penalties. 29 U.S.C. § 666. Penalties range up to $13,653 for any violation, with willful or repeated offenses triggering penalties up to $136,532. *Id.* § 666(a), (c); *see* 28 U.S.C. § 2461 note; OSHA Penalties, *supra*. In addition, willful violations that result in an employee's death can result in a year of imprisonment. 29 U.S.C. § 666(e).

#### 2.    *OSHA Standards*

At a high level of generality, "the Act authorizes the Secretary to promulgate three different kinds of standards—national consensus standards, permanent

standards, and temporary emergency standards." *Benzene*, 448 U.S. at 640 n.45 (plurality). This case does not involve OSHA's authority to adopt national consensus standards or emergency temporary standards, both of which allow for less discretion in the rulemaking process. For example, to issue an "emergency temporary standard" under § 655(c), the Secretary must determine both that "employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards" and that the "emergency standard is necessary to protect employees from such danger." 29 U.S.C. § 655(c). The Secretary's authority to issue emergency temporary standards, such as the COVID-19 vaccine mandate now under review in the Sixth Circuit, is not at issue here.

This case instead involves a subset of so-called "permanent standards," which flow from OSHA's authority to promulgate "any occupational safety or health standard." 29 U.S.C. § 655(b). Permanent standards are bifurcated into (1) "'health' standards" dealing with "latent hazards, such as carcinogens" and (2) "'safety' standards" addressing "hazards that cause immediately visible physical harm." *Int'l Union v. OSHA*, 938 F.2d 1310, 1313 (D.C. Cir. 1991) (*Int'l Union I*); *accord Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 512 (1981) (*Cotton Dust*).

This case does not involve the first category, health standards, which deal with "toxic materials or harmful physical agents." 29 U.S.C. § 655(b)(5). For these standards, the Act specifically requires OSHA to "set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity

even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life." *Id.* The Supreme Court has concluded that this provision requires OSHA to "enact the most protective standard possible to eliminate a significant risk of material health impairment, subject to the constraints of economic and technological feasibility," with no room for "any further balancing" of costs and benefits. *Cotton Dust*, 452 U.S. at 495, 513; *see id.* at 509.

By contrast, this case involves a challenge to OSHA's authority to enact and enforce safety standards—*i.e.*, "permanent standards other than those dealing with toxic materials and harmful physical agents." *Benzene*, 448 U.S. at 640 n.45 (plurality). Unlike for the other standards discussed above, the Act does not provide any similar guidance or constraint on the content of safety standards, including what issues they should cover, what substantive provisions they should contain, or what level of risk they should mitigate. Instead, the "only substantive criteria" for safety standards comes from the "definitions" section, *id.*, which defines an "occupational safety and health standard" as one that is "reasonably necessary or appropriate to provide safe or healthful employment and places of employment," 29 U.S.C. § 652(8).

A Supreme Court plurality has read the word "safe" in this provision to require "a threshold finding that a place of employment is unsafe—in the sense that significant risks are present." *Benzene*, 448 U.S. at 642 (plurality). And a Supreme Court majority has stated in dicta that "any standard that was not economically or technologically feasible would … not be 'reasonably necessary or appropriate'" based on "legislative history" indicating that "'Congress does not appear to have intended

6

to protect employees by putting their employers out of business.'" *Cotton Dust*, 452 U.S. at 513 n.31. Beyond this, the Supreme Court has not tried to define the meaning of "reasonably necessary or appropriate" under the Act. Nor has it ever resolved whether this provision constitutes an unlawful delegation of legislative power.

### 3. OSHA Practice

OSHA has adopted various safety standards governed by the "reasonably necessary or appropriate" provision. 29 U.S.C. § 652(8). These safety standards cover matters from electrical safety, 29 C.F.R. § 1910.147; to personal protective equipment, *id.* § 1910.132; to working in confined spaces, *id.* § 1910.146. The agency enforces its standards through a combination of inspections, citations, and penalties. In fiscal year 2020, for example, OSHA conducted a total of 21,674 inspections, nearly 60% (12,948) of which were conducted without an employer's prior knowledge. OSHA Enforcement, *supra*. During the same period, OSHA issued more than 36,000 citations, with penalties totaling over $136 million. Industry Profile, *supra*. Several of the ten most frequently cited OSHA standards are safety standards based on the "reasonably necessary or appropriate" provision. *See* OSHA, *Top 10 Most Frequently Cited Standards for Fiscal Year 2020*, https://bit.ly/3E8PxKB (last visited Dec. 3, 2021); 29 C.F.R. §§ 1910.147, 1926.451, 1926.501, 1926.503.

## B. Allstates Refractory Contractors, LLC

One of the many American employers whose work is significantly affected by OSHA's safety standards is Allstates, a Toledo-based general contractor that provides furnace services to the glass, metals, and petrochemical industries. Boothe Decl. ¶¶ 1-

7

3. In addition to its four full-time employees, Allstates hires many part-time employees as needed for each job, including sometimes up to 100. *Id.* ¶ 6.

Allstates prides itself on its commitment to worker safety. *Id.* ¶ 7. Over the past 200,000 hours worked by its employees—an amount that takes the company years to accumulate given its small number of full-time workers—Allstates has not experienced a single OSHA-recordable work-related injury. *Id.* In addition, Allstates' experience modification rate—a statistic used to determine the likelihood that a given business will experience a worker's compensation claim—is well below 1.0, which means that it is considered safer than most other businesses in the industry. *Id.* ¶ 8.

While Allstates is dedicated to protecting its workers from harm, it is convinced that a number of OSHA standards are unnecessarily burdensome or dangerous. Every year, for instance, Allstates spends thousands on both training its employees to comply with OSHA standards as well as adhering to those rules. *Id.* ¶¶ 11-12; *see id.* ¶¶ 9-25. The company incurs these costs even when it believes its own safety measures would be just as effective as the ones mandated by OSHA, if not more so. *Id.* ¶ 25. And the company is forced to comply with OSHA standards even when doing so is more dangerous than adhering to its own safety measures. *Id.* ¶ 30. For example, Allstates believes that OSHA's standards governing fall protection and confined spaces are unsafe in high-heat environments because they do not allow workers to move quickly enough to avoid injury from heat exposure. *Id.* But nevertheless, OSHA requires Allstates to comply on pain of substantial penalties.

8

The threat of penalties is very real. *Id.* ¶¶ 25-29. In 2019, for example, OSHA fined Allstates more than $10,000 for violating its standards governing falling-object protection and cited the company for violating its standards governing hand and power tools. *Id.* ¶ 26. The White House recently announced that OSHA will step up enforcement on employers, like Allstates, that work in high-heat environments, and OSHA has initiated rulemaking in this area as well. *See* Heat Injury and Illness Prevention in Outdoor and Indoor Work Settings, 86 Fed. Reg. 59,309 (Oct. 27, 2021); The White House, *FACT SHEET: Biden Administration Mobilizes to Protect Workers and Communities from Extreme Heat* (Sept. 20, 2021), https://bit.ly/3vJU1DS.

## STANDARD OF REVIEW

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201; *see id.* § 2202; Fed. R. Civ. P. 57.

The standard for a permanent injunction " 'is essentially the same as for' " a preliminary one, "with the exception that the plaintiff must show … actual success" on the merits. *Winter v. NRDC*, 555 U.S. 7, 32 (2008). Thus, in addition to prevailing on the merits, a movant must show "(1) that it has suffered an irreparable injury; (2)

that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "[T]he harm to the opposing party and the public interest factors 'merge when the Government is the opposing party.'" *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020).

## ARGUMENT

**I.** **Congress's Delegation of Authority to Write "Reasonably Necessary or Appropriate" Safety Standards Violates Article I of the Constitution.**

    **A.** **The Delegation Here Lacks an Intelligible Principle.**

        ***1.*** ***The Intelligible Principle Test***

Article I of the Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. "This text permits no delegation of those powers." *Whitman v. Am. Trucking Assn's*, 531 U.S. 457, 472 (2001). This principle, often referred to as the nondelegation doctrine, advances individual liberty and government accountability.

As to liberty, allowing a single branch to both write and enforce the law invites arbitrary rule. Preventing the Executive Branch from wielding legislative power thus heeds "the famous warning of Montesquieu, quoted by James Madison in The Federalist No. 47, that 'there can be no liberty where the legislative and executive powers are united in the same person.'" *Bowsher v. Synar*, 478 U.S. 714, 721-22

10

(1986) (cleaned up); *accord Gundy v. United States*, 139 S. Ct. 2116, 2135 (2019) (Gorsuch, J., dissenting).

As to accountability, the framers designed the Constitution to ensure that legislative choices would be made by Congress, the branch "most responsive to the will of the people." *Tiger Lily, LLC v. HUD*, 5 F.4th 666, 674 (6th Cir. 2021) (Thapar, J., concurring). Members of Congress know that if they enact unpopular laws, they can be held accountable at the ballot box. To avoid that accountability, they have a natural "incentive to insulate [themselves] from the consequences of hard choices" by delegating broad authority to obscure administrative agencies, thus "shifting responsibility to a less accountable branch." *Id.*; *see Gundy*, 139 S. Ct. at 2135 (Gorsuch, J., dissenting) ("Legislators might seek to take credit for addressing a pressing social problem by sending it to the executive for resolution, while at the same time blaming the executive for the problems that attend whatever measures he chooses to pursue."). That is exactly what Article I is designed to prevent, by keeping the legislative power in the hands of elected officials.

In an effort to prevent the unconstitutional delegation of legislative power, the Supreme Court has insisted that "Congress must 'lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform.'" *Whitman*, 531 U.S. at 472 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)) (cleaned up). The theory behind this requirement is that so long as Congress has enacted a sufficiently clear principle, it has "already …

11

exercised" the "legislative power" and left the Executive Branch to merely handle "the details" of the statute's "execution." *J.W. Hampton*, 276 U.S. at 406-07.

To supply an intelligible principle, Congress must therefore at least "clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). This not only ensures accountability for Congress by requiring it to set forth relatively clear and specific policy choices, but also allows "courts to test" whether the Executive Branch has faithfully executed the legislative command. *Id.; see Yakus v. United States*, 321 U.S. 414, 425 (1944) (explaining that a delegation must "sufficiently mark[] the field" so that courts can "ascertain whether the will of Congress has been obeyed"). In short, Congress must "meaningfully constrain[]" the Executive Branch's authority through "specific restrictions" on its discretion. *Touby v. United States*, 500 U.S. 160, 166-67 (1991).

Consistent with this framework, the Supreme Court has twice found Congress to have unconstitutionally delegated its legislative authority. In *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), the Court confronted a provision of the National Industrial Recovery Act that gave the President the power, if he deemed it appropriate, to ban the interstate transportation of "'hot oil'"—*i.e.*, petroleum "'produced or withdrawn from storage in excess of the amount permitted'" under state law. *Id.* at 406, 418. The Court held that this provision violated Article I because Congress was trying to abdicate its responsibility for making the difficult policy choice about whether to enact a ban. The law "did not declare in what circumstances

12

that transportation should be forbidden," and thereby "left the matter to the President without standard or rule, to be dealt with as he pleased." *Id.* at 418.

Several months later, the Court took the same approach with respect to another unconstitutional delegation involving another portion of the National Industrial Recovery Act in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). That provision empowered the President, if he deemed it appropriate, to enact "'codes of fair competition'" written by trade associations. *Id.* at 521 n.4. Although the law expressly conditioned the President's authority on certain findings—including that the codes "will tend to effectuate the policy of" the statute (as described in its declaration of purposes)—the Court was unmoved. *Id.* As it explained, given "the scope of that broad declaration and of the nature of the few restrictions that are imposed, the discretion of the President in approving or prescribing codes, and thus enacting laws for the government of trade and industry throughout the country, is virtually unfettered." *Id.* at 541-42. Justice Cardozo, who had dissented in *Panama Refining*, wrote a concurring opinion explaining that the rulemaking power given to the President here was "as wide as the field of industrial regulation" and hence "delegation running riot." *Id.* at 553.

As *Schechter Poultry* underscores, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475. Accordingly, if Congress empowers an agency to establish "standards that affect the entire national economy," "it must provide substantial

13

guidance." *Id.*; *see id.* at 474 (explaining that in *Schechter Poultry*, Congress had "conferred authority to regulate the entire economy").

### 2. The Absence of an Intelligible Principle Here

"As was true of the standard upset in *Schechter*, the scope of the regulatory program" here "is immense, encompassing all American enterprise." *Int'l Union I*, 938 F.2d at 1316-17. OSHA's safety standards apply to virtually every employer in the United States on pain of significant civil and criminal penalties. *See* 29 U.S.C. §§ 652(5), 666. Because these safety standards "affect the entire national economy," Congress had to "provide substantial guidance" about what type of safety rules are appropriate. *Whitman*, 531 U.S. at 475. But it failed to do so.

When it comes to OSHA's delegated authority to "promulgate, modify, or revoke any occupational safety … standard," 29 U.S.C. § 655(b), the Act imposes no "constraints" beyond those contained in the statute's definition of an occupational safety and health standard. *Int'l Union*, 938 F.2d at 1316; *accord Benzene*, 448 U.S. at 641 n.45 (plurality). Specifically, the Act defines a safety standard as one that "requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, *reasonably necessary or appropriate* to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8) (emphasis added). The phrase "to provide safe or healthful employment and places of employment" offers little in the way of meaningful constraints: Although a Supreme Court plurality has construed the word "safe" to require "a threshold finding of significant risk," it has acknowledged that OSHA's "determination that a particular

14

level of risk is 'significant' will be based largely on policy considerations." *Benzene*, 448 U.S. at 643, 655 n.62 (plurality). Accordingly, the delegation here entails the power to make any workplace-safety rule that OSHA itself deems "appropriate"— even if the rule is not "reasonably necessary."

"One does not need to open up a dictionary in order to realize the capaciousness of this phrase." *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (addressing "appropriate and necessary"). Take "reasonably necessary." "In the strictest sense of the term, something is 'necessary' only if it is essential," and "it makes little sense to refer to something as being 'reasonably essential.'" *Ayestas v. Davis*, 138 S. Ct. 1080, 1093 (2018). So "reasonably necessary" may just mean "sufficiently important." *Id.* Or it may mean "useful." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413 (1819) (Marshall, C.J.) (explaining that "the word 'necessary' … frequently imports no more than that one thing is convenient, or useful, or essential to another"). But the phrase offers no indication how OSHA is to determine what is "sufficiently important" or "useful," or how courts are to go about reviewing those determinations.

Likewise, the word "'appropriate' is 'the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors.'" *Michigan*, 576 U.S at 752. This term, which "means specially fitted or suitable, proper," is "open-ended on its face" and "inherently context dependent." *Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020) (cleaned up). But here, there is no context revealing how OSHA might determine what workplace-safety rules are "proper."

Making matters worse, Congress phrased this provision in the disjunctive, allowing OSHA to issue safety standards that are either "reasonably necessary *or* appropriate." 29 U.S.C. § 652(8) (emphasis added). So even if a standard would not qualify as "reasonably necessary" (whatever that might mean), OSHA could still issue it so long as it were "appropriate." Or vice versa. In short, Congress told OSHA to write whatever safety rules it deems "sufficiently important," "useful," or "proper," without leaving the agency any clues as to how to apply those words in practice. For example, Congress did not "reference any pre-existing common law" governing workplace safety "that might have supplied guidance." *Gundy*, 139 S. Ct. at 2137 (Gorsuch, J., dissenting) (discussing *Schechter Poultry*). Nor was there even any "discussion in the legislative history of the meaning of the phrase 'reasonably necessary or appropriate.'" *Cotton Dust*, 452 U.S. at 515 n.33.

The sweeping nature of this language was almost certainly deliberate. What then-Justice Rehnquist said about § 655(b)(5)'s more detailed requirements for health standards applies with even greater force to safety standards: "It is difficult to imagine a more obvious example of Congress simply avoiding a choice that was both fundamental for purposes of the statute and yet politically so divisive that the necessary decision or compromise was difficult, if not impossible, to hammer out in the legislative forge." *Benzene*, 448 U.S. at 687 (Rehnquist, J., concurring in the judgment). Writing workplace-safety regulations necessarily involves "balancing statistical lives and industrial resources," *id.* at 685, and thus requires hard policy choices. For example, should "the statistical possibility of future deaths … ever be

16

disregarded in light of the economic costs of preventing those deaths?" *Id.* at 672. If so, how is a decisionmaker to go about balancing the lives of workers against economic harms? If a safety rule will save a hundred lives but cost a million jobs, should it be enacted? This is exactly the type of difficult policy question that Article I requires to be made by elected representatives who are accountable to the voters—not faceless bureaucrats who are insulated from the will of the people.

Instead of making these "important choices of social policy," Congress chose to punt them to an unelected and unaccountable agency. By enacting such a broad and vague delegation of rulemaking power to OSHA—with no intelligible principle for determining what counts as an "appropriate" safety standard—Congress ripped that policy decision out of the democratic process and gave it "to the Secretary of Labor and, derivatively, to th[e] Court[s]." *Id.* at 672, 685, 687.

From early on, the government acknowledged that "[t]he phrase 'reasonably necessary or appropriate' is not a limitation on the Secretary's powers or a substantive standard of any sort." OSHA *Benzene* Br. at 43. And the government explained that to the extent that it has any "substantive meaning" at all, this phrase "permits the Secretary to issue any standard that he rationally concludes is appropriate for the protection of the health and safety of employees under the substantive provisions of the Act." *Id.* at 43, 46. According to the government, that was how Congress understood "the phrase 'reasonably necessary or appropriate'" in an earlier statute—namely, as directing an executive officer "to impose certain requirements 'as in his opinion are necessary to effectuate the purposes of this title.'"

17

Reply Br. for the Federal Parties at 20 n.15, *Benzene*, 448 U.S. 607 (Nos. 78-911, 78-1036), 1979 WL 199559. It is hard to imagine a more candid admission of such a sweeping and unconstitutional delegation of legislative power from Congress.

If telling OSHA to write "reasonably necessary or appropriate" workplace-safety rules is an intelligible principle, anything is. Rather than merely requiring the agency "to make judgments of degree," the delegation here invites it to engage in "the prescription of the standard that Congress ha[s] omitted." *Whitman*, 531 U.S. at 473, 475. And that leaves courts with no way to "ascertain whether the will of Congress has been obeyed," *Yakus*, 321 U.S. at 425, as it is unclear how any judge could begin to assess whether a given OSHA safety rule is "reasonably necessary or appropriate."

The delegation here is thus materially indistinguishable from the one in *Schechter Poultry*. In both instances, Congress gave the Executive Branch "virtually unfettered" discretion to write "laws for the government of trade and industry throughout the country"—all backed by the potential of criminal sanctions. *Schechter Poultry*, 295 U.S. at 542; *see id.* at 529. Yet despite the staggering breadth of that authority, the only instruction given to the Executive Branch was to write safety regulations that are "reasonably necessary or appropriate," 29 U.S.C. § 652(8)—which is "no more precise a standard than stimulating the economy by assuring 'fair competition,'" *Whitman*, 531 U.S. at 474 (discussing *Schechter Poultry*).

### 3.    *OSHA's Prior Defenses of this Delegation*

To avoid scrutiny of this sweeping delegation of power, OSHA has previously used two different strategies. Each is meritless.

18

### a.  *Self-Imposed Limitations*

In the past, OSHA has sought to disclaim some of its authority to issue safety regulations. After a Supreme Court plurality rejected the agency's initial view that the "reasonably necessary or appropriate" language "has no legal significance, or at best merely requires that a standard not be totally irrational," *Benzene*, 448 U.S. at 639 (plurality), OSHA took the position that there were only "two boundaries" when it came to safety standards. *Int'l Union I*, 938 F.2d at 1317; *see* Control of Hazardous Energy Sources (Lockout/Tagout), 54 Fed. Reg. 36,644 (Sept. 1, 1989). First, the agency adopted the conclusion of the *Benzene* plurality that it must find a "significant risk" before adopting any permanent standard. 54 Fed. Reg. at 36,652-53; *see Benzene*, 448 U.S. at 642 (plurality). Second, OSHA adopted the dicta from *Cotton Dust* that any permanent standard must be "technologically and economically feasible." 54 Fed. Reg. at 36,656; *see Cotton Dust*, 452 U.S. at 513 n.31. "But on the agency's reading, feasibility work[ed] only as a ceiling, and not," as with health standards governed by § 655(b)(5), "as a floor." *Int'l Union I*, 938 F.2d at 1317. In other words, while OSHA was forbidden from imposing standards that were technologically or economically infeasible, it remained free to reject "more stringent rules than those adopted" even when those alternatives "were feasible" ones. *Id.*

The D.C. Circuit explained that even with these two boundaries, the "reasonably necessary or appropriate" provision, as read by OSHA, posed "a serious nondelegation issue." *Id.* As that court observed, this grant of authority—which encompassed "all American enterprise"—would leave OSHA with the "power, once

19

significant risk is found, to require precautions that take the industry to the verge of economic ruin (so long as the increment reduces a significant risk), or to do nothing at all." *Id.* (internal citation omitted). That discretion in turn created "opportunities for favoritism," as "[t]he costs of compliance with a standard will vary among firms in an industry, so the power to vary the stringency of the standard is the power to decide which firms will live and which will die." *Id.* at 1318. Because this reading "would give the executive branch untrammeled power to dictate the vitality and even survival of whatever segments of American business it might choose," the D.C. Circuit remanded the matter to OSHA. *Id.*; *see id.* at 1326.

OSHA then changed its position again. On remand, the agency stated that because "the Act's purpose is to achieve a high degree of worker protection," it could not stand idly by upon "find[ing] a significant risk to worker safety." Control of Hazardous Energy Sources (Lockout/Tagout), 58 Fed. Reg. 16,612, 16,615 (Mar. 30, 1993). Taking this to mean that "OSHA reads the Act to permit it to deviate only modestly from the stringency required … for health standards" in issuing safety standards, the D.C. Circuit concluded that, "as construed by OSHA, the Act guides its choice of safety standards enough to satisfy the demands of the nondelegation doctrine." *Int'l Union v. OSHA*, 37 F.3d 665, 669 (D.C. Cir. 1994) (*Int'l Union II*).

Following that decision, however, the Supreme Court in *Whitman* rejected the premise that "an agency can cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute." 531 U.S. at 472. That

leaves OSHA where it was before it adopted its latest position—namely, with "a serious nondelegation issue." *Int'l Union I*, 938 F.2d at 1317.

### b.    *Statutory Construction*

In the wake of *Whitman*, OSHA therefore pivoted to arguing that the Act itself—as opposed to the agency's self-imposed limits on its discretion—compels the same reading of "reasonably necessary or appropriate" as the one it offered before. *See* Br. for the Fed. Resps. in Opp. at 7-9, *Nat'l Maritime Safety Ass'n v. OSHA*, 566 U.S. 936 (2012) (No. 11-711) (denying certiorari), 2012 WL 769611 (NMSA Opp.). According to the agency, Congress required "OSHA to promulgate safety standards providing 'a high degree of worker protection,' a criterion not substantially different from that applicable to health standards under 29 U.S.C. 655(b)(5)." *Id.* at 8. In other words, once OSHA determines that a workplace condition poses a significant risk, it believes the Act compels it to issue a safety standard that will "eliminate that risk to the extent that it is technologically and economically feasible to do so," with the (unelaborated) ability "to deviate only modestly" from that level of "stringency." Resp. Br. at 48-49, *Nat'l Maritime Safety Ass'n v. OSHA*, 649 F.3d 743 (D.C. Cir. 2011) (No. 09-1050), 2010 WL 3564765.

Wherever that standard comes from, it is not the Occupational Safety and Health Act. It is hard to see how the authority to enact "reasonably necessary or appropriate" safety standards, 29 U.S.C. § 652(8), could ever be read to require OSHA to impose the most stringent standard feasible (or something close to it). Rather, this provision on its face gives the agency the power to enact whatever safety rules it

21

deems "appropriate," based on any relevant considerations. That is indistinguishable from a grant of lawmaking power to a legislature, allowing it to enact whatever laws it deems reasonably necessary or appropriate within the defined sphere. For example, Article I gives Congress the power to make any laws that are "necessary and proper" to ensuring the collection of taxes for the "general Welfare of the United States," but nobody thinks Congress is required to impose the most stringent tax burdens feasible. U.S. Const. art. I, § 8, cls. 1, 18.  Even more clearly here, the *disjunctive* power to make "reasonably necessary *or* appropriate" safety rules does not impose any maximum-stringency requirement.

Lacking any plausible basis in the text of the operative provision, OSHA has tried to locate the source of its limiting construction in "the Act's overriding purpose," which it has derived from other "statutory provisions." 58 Fed. Reg. at 16,614. For example, the agency has relied on the statute's prefatory declaration of Congress's broad "purpose and policy … to assure so far as possible every working man and woman in the Nation safe and healthful working conditions," 29 U.S.C. § 651(b), to conclude that "the Act's purpose is to provide a high degree of worker protection," 58 Fed. Reg. at 16,615. But not even OSHA reads that declaration for all it is worth, as it maintains that the Act allows it "to deviate" (even if "modestly") from the requirement to ensure workplace safety to the point of economic and technological feasibility. *Int'l Union II*, 37 F.3d at 669.

Indeed, if the Act's declaration of purpose "to assure so far as possible … safe and healthful working conditions," 29 U.S.C. § 651(b), established a substantive test,

22

then Congress's different criteria for health standards, *id.* § 655(b)(5), and safety standards, § 652(8), would be meaningless. OSHA's position that the statutory requirement for safety standards is "not substantially different from that applicable to health standards," NMSA Opp. 8, would eliminate the Act's distinction between the two. But as the Supreme Court has explained, whatever "reasonably necessary or appropriate" means, "Congress specifically chose in [§ 655(b)(5)] to impose separate and additional requirements for issuance of a subcategory of occupational safety and health standards dealing with toxic materials and harmful physical agents: it required that those standards be issued to prevent material impairment of health *to the extent feasible*." *Cotton Dust*, 452 U.S. at 512. And that was because "Congress could reasonably have concluded that *health* standards should be subject to different criteria than *safety* standards because of the special problems presented in regulating them." *Id.*; *see Benzene*, 448 U.S. at 649 n.54 (plurality) (stating that "Congress enacted" § 655(b)(5) because when it comes to safety standards, "the risks are generally immediate and obvious," whereas in the context of health standards, "the risks may not be evident until a worker has been exposed for long periods of time to particular substances").

This problem with OSHA's limiting construction "drive[s] home a broader point": Whatever a statute's "declaration of purpose" says, "no legislation pursues its purposes at all costs, and every statute purposes, not only to achieve certain ends, but also to achieve them by particular means." *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 637 (2012) (cleaned up). So while the Act may declare that its broad purpose

is "to assure so far as possible … safe and healthful working conditions," 29 U.S.C. § 651(b), its actual grant of regulatory authority is separately defined. When it comes to safety standards, the statute authorizes OSHA to serve the vaguely defined purpose of workplace safety through any standards that it deems "reasonably necessary or appropriate," with no intelligible principle to decide what qualifies and what does not. *Id.* § 652(8). And because OSHA's strained interpretation of what "reasonably necessary or appropriate" means is not a remotely plausible reading of the text, it is left with same nondelegation problem as before.

### B. If the Delegation Here Supplies an Intelligible Principle, the Intelligible Principle Test Should Be Reconsidered.

If even a delegation to issue "reasonably necessary or appropriate" safety standards for the entire economy is sufficient to satisfy the intelligible principle test, that doctrine should be revisited—an action a majority of the current Supreme Court has recently suggested. Justice Gorsuch, joined by the Chief Justice and Justice Thomas, observed a few years ago that the "mutated version of the 'intelligible principle' remark has no basis in the original meaning of the Constitution, in history, or even in the decision from which it was plucked." *Gundy*, 139 S. Ct. at 2139 (dissenting). Justice Alito has likewise made clear that he "would support" an effort "to reconsider" this test. *Id.* at 2131 (concurring in the judgment). And Justice Kavanaugh has remarked that "Justice Gorsuch's scholarly analysis of the Constitution's nondelegation doctrine … may warrant further consideration." *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (statement respecting denial of certiorari);

*cf.* Amy Coney Barrett, *Suspension and Delegation*, 99 Cornell L. Rev. 251, 318 (2014) (describing the "'intelligible principle' test" as "notoriously lax").

These recent Supreme Court opinions confirm that Congress may not delegate "the legislative power"—*i.e.*, "the power to adopt generally applicable rules of conduct governing future actions by private persons." *Gundy*, 139 S. Ct. at 2133 (Gorsuch, J., dissenting). Yet that is precisely what the Act's directive to OSHA to write "reasonably necessary or appropriate" safety standards does. 29 U.S.C. § 652(8). To be sure, so long as Congress "prescribes the rule governing private conduct," it may (1) "authorize another branch to 'fill up the details'"; (2) "make the application of that rule depend on executive fact-finding"; or (3) "assign the executive … branch[] certain non-legislative responsibilities." *Gundy*, 139 S. Ct. at 2136-37 (Gorsuch, J., dissenting). But the delegation here plainly does not fall into any of those categories.

At a minimum, as "Justice Rehnquist's opin[ion]" in *Benzene* explained, "major national policy decisions must … not be delegated by Congress." *Paul*, 140 S. Ct. at 342 (Kavanaugh, J., statement respecting denial of certiorari) (suggesting a willingness to enforce this aspect of Article I); *see Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825) (Marshall, C.J.) (distinguishing "those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details"). And how to balance "statistical lives and industrial resources" in the context of safety standards—setting rules that trade off worker safety versus economic prosperity in every workplace around the

25

country—undoubtedly qualifies as one of those "important choices of social policy" that must be "made by Congress." *Benzene*, 448 U.S. at 685-86 (Rehnquist, J., concurring in the judgment) (addressing the issue in the context of § 655(b)(5)).

While this Court is required to apply the intelligible principle test, it should not stretch that doctrine to justify a delegation that would have been unfathomable to the generation that wrote and ratified the Constitution. To the extent not foreclosed by precedent, the Court should apply the nondelegation doctrine consistent with the constitutional purpose of Article I, which is to ensure that significant policy choices are made by Congress, not shunted off to unaccountable bureaucracies. In any event, Allstates makes these points to preserve the issue for further review.

## II.    This Court Should Enter Declaratory and Injunctive Relief

This Court should enter a declaratory judgment and permanent injunction preventing the government from enforcing the statutory mandate to obey safety standards issued under 29 U.S.C. § 655(b). A "separation-of-powers violation" can be remedied through "declaratory relief," *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 513 (2010), and an injunction is warranted here as well. In particular, the injunction should prevent the government from imposing statutory penalties for failure to obey the Act's mandate to comply with safety standards issued under 29 U.S.C. § 655(b).

When it comes to the propriety of granting injunctive relief "[i]n constitutional cases," success on the merits "is typically dispositive." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021). To start, when "'constitutional rights are threatened or impaired, irreparable injury is presumed.'" *Id.* Allstates is thus currently suffering

irreparable injury from being forced to comply with an unconstitutional statutory mandate based on an unconstitutional delegation of legislative power to OSHA. In addition, Allstates is also sustaining ongoing financial injuries that cannot be remedied later. Without an injunction, Allstates, along with employers across the country, must bear the cost of complying with federal safety regulations issued under an unconstitutional delegation. Every year, Allstates alone loses thousands of dollars in compliance costs, Boothe Decl. ¶¶ 11-12, and the government's sovereign immunity precludes the company from seeking monetary damages to redress this injury. Thus, here as elsewhere, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and concurring in the judgment); *see, e.g.*, *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (concluding that CDC's eviction "moratorium has put the applicants, along with millions of landlords across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery").

Conversely, "no cognizable harm results from stopping unconstitutional conduct, so 'it is always in the public interest to prevent violation of a party's constitutional rights.'" *Vitolo*, 999 F.3d at 360. Even when "the public has a strong interest" in a government objective, "our system does not permit agencies to act unlawfully." *Alabama Ass'n of Realtors*, 141 S. Ct. at 2490.

## CONCLUSION

The Court should enter summary judgment granting declaratory and injunctive relief to Allstates.

Dated: December 3, 2021                    Respectfully submitted,


                                           */s/ Christopher M. McLaughlin*
Brett A. Shumate (*pro hac vice*)          Christopher M. McLaughlin (0078186)
Email: bshumate@jonesday.com               Email: cmmclaughlin@jonesday.com
John M. Gore (*pro hac vice*)              JONES DAY
Email: jmgore@jonesday.com                 North Point, 901 Lakeside Avenue
Anthony J. Dick (*pro hac vice*)           Cleveland, Ohio 44114-1190
Email: ajdick@jonesday.com                 Telephone: (216) 586-3939
JONES DAY                                  Facsimile: (216) 579-0212
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: (202) 879-3939                  J. Benjamin Aguiñaga (*pro hac vice*)
Facsimile: (202) 626-1700                  Email: jbaguinaga@jonesday.com
                                           JONES DAY
                                           2727 North Harwood Street Suite 500
                                           Dallas, Texas 75201-1515
                                           Telephone: (214) 220-3939
                                           Facsimile: (214) 969-5100

                                           *Counsel for Plaintiff Allstates Refractory*
                                           *Contractors, LLC*

## CERTIFICATES OF SERVICE AND LENGTH

I hereby certify that on December 3, 2021, a copy of the foregoing Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

I also hereby certify that this memorandum complies with the page limits set forth in the Court's October 25, 2021 Scheduling Order.

*/s/ Christopher M. McLaughlin*
Counsel for Plaintiff
Allstates Refractory Contractors, LLC